Opinion issued August 13, 2019



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00430-CV
_____

**CITY OF FORT WORTH, TEXAS, Appellant**

**V.**

**PRINT EARL CLARK, SR., Appellee**

---

**On Appeal from the 236th District Court**
**Tarrant County, Texas**
**Trial Court Case No. 236-279735-15**

---

## MEMORANDUM OPINION

This is a workers' compensation case. Print Earl Clark, Sr. was involved in an on-the-job vehicle collision while working for the City of Fort Worth. He later sought medical treatment for back pain with radiculopathy to his lower extremities.

Eventually, he sought lifetime income benefits under a provision for total loss of use of two extremities, specifically, both feet.

The Texas Department of Insurance, Division of Workers' Compensation denied his claim. Clark sought judicial review, and the case was tried to a Tarrant County jury. The jury found that Clark met his burden for establishing entitlement to lifetime income benefits, and the trial court entered a judgment requiring the City to provide income and medical benefits. The City appeals.

The City contends the evidence is insufficient to support the jury's finding. It further contends that the trial court erred in limiting questioning of Clark about other jobs he had applied for and excluding certain exhibits related to his job search. Finally, it contends there was reversible error in the court's jury charge.

We affirm.

## Background

Clark was employed by the City of Fort Worth for 17 years as a roofer. In March 2008, Clark's work truck was stopped at a stoplight when two nearby vehicles collided and one of those vehicles struck Clark's truck. Initially, Clark told medical professionals he was experiencing pain in his lower back that radiated down his right leg with numbness and tingling. Over the next year, Clark saw various medical doctors for testing, treatment, and workers' compensation evaluations. In 2009, Clark began seeking treatment from a chiropractor,

2

Dr. Kenneth Ericksen. Clark described how pain limited his ability to engage in physical activity one year after the collision:

> I was limited to the amount of weight that I could pick up . . . [and] I could stand up maybe 10 or 15 minutes at a time, because the longer I stand up, the more the radiating down my leg would get until I had to sit down, and my back just hurt[] all the time.

Ericksen restricted Clark's work and other activities due to his injury. Clark qualified for Workers' Compensation supplemental income benefits. Clark's pain continued. Ericksen continued to restrict his physical activity.

In April 2009, the Division of Workers' Compensation referred Clark to a designated doctor, Dr. Melvyn Bernstein. Bernstein ordered an electrodiagnostic test and physically examined Clark. Bernstein's medical conclusion was that Clark had reached maximum medical improvement (known as "MMI") as of April 14, 2009 and had a whole-person impairment rating of 25%.

Clark eventually sought lifetime income benefits, which are paid until the death of the employee at a rate of 75% of the employee's average weekly rate. *See* TEX. LAB. CODE § 408.161(a), (c). Lifetime income benefits are paid for only seven specific categories of injuries. *Id.* § 408.161(a)(1–7). The injury specified in Clark's Workers' Compensation claim was loss of use of both feet at or above the ankle. *See id.* § 408.161(a)(2).

Under the Labor Code, loss of a body part means "the total and permanent loss of use" of that body part. *Id.* § 408.161(b). "Total loss of use of a member of

the body exists whenever by reason of injury such member no longer possesses any substantial utility as a member of the body or *the condition of the injured member is such that the worker cannot get and keep employment requiring the use of such member*." *Galindo v. Old Republic Ins. Co.*, 146 S.W.3d 755, 759 (Tex. App.—El Paso 2004, pet. denied) (emphasis added). Clark relied on the second, alternative definition.

In advance of a contested hearing on Clark's claim for lifetime income benefits, Clark was required to submit to a "carrier required medical examination" by an evaluator selected on behalf of his employer. The City of Fort Worth selected Dr. Donald Mauldin, who examined Clark in February 2015. While Clark's chiropractor, Ericksen, had opined that Clark met the criteria for lifetime income benefits after noting that "extended/prolonged activity causes significant increase in pain and symptoms which necessitate frequent and extended breaks which an Employer will not allow," Mauldin determined that Clark did not. Mauldin opined that Clark "does not have anywhere near total loss of a lower extremity."

The Division of Workers' Compensation's hearing officer held a contested hearing in April 2015 to decide whether Clark was entitled to lifetime income benefits "based on a total loss of use of both feet." The hearing officer determined that Clark was not. Specifically, the hearing officer determined that Clark had a

4

compensable injury that resulted in physical restrictions but that Clark failed to meet either criterion for "total loss of use." Clark failed to prove that he "no longer possesses any substantial utility of both feet at or above the ankle as a member of the body" or that "his bilateral lower extremity condition is such that he cannot get and keep employment requiring the use of both feet at or above the ankle as a result of the compensable injury." Clark's claim for lifetime income benefits was denied, and Clark sought judicial review through a jury trial.

The parties entered into various stipulations, which narrowed the scope of the jury trial. In opening statements, Clark's attorney explained that the only issue for the jury to decide was whether Clark sustained a total loss of use of his feet at or above the ankles, as the term "total loss of use" would be defined for the jury, such that Clark would be entitled to lifetime income benefits. Clark's attorney told the jury that the case would not be about whether Clark had been hurt or whether he was permanently impaired because "[n]obody disputes that."

During the City's opening statement, the City's attorney previewed its evidence and told the jury that Clark's injury was to his back, not his feet. The attorney stated that, to the extent Clark had any complaints of pain beyond his lower back, Clark's only complaint was of pain radiating into his right leg, not both. The City's attorney highlighted that "only one doctor in this case gives the

opinion that Mr. Clark has permanently lost the use of both feet at or above the ankle, and that's his chiropractor, Dr. Ericksen."

The jury received testimony from three witnesses: Clark, Ericksen and Mauldin. Clark testified in person, while Ericksen and Mauldin testified by deposition. The jury received a large amount of documentary evidence, including close to 400 pages of medical records, medical reports, and related physician materials. Then, the jury was asked to determine whether Clark met the burden for entitlement to lifetime income benefits on the claim of total loss of use of both feet. We will summarize the testimony and documentary evidence below before reviewing the jury's determination.

### *Testimony of Ericksen and Clark*

Excerpts of Ericksen's deposition testimony were read to the jury. Ericksen testified that he is familiar with the workers' compensation criteria because, while his involvement in this case was as a treating chiropractor, the Division of Workers' Compensation has qualified him as a designated doctor, and he has experience opining on impairment ratings and maximum medical improvement determinations.

Ericksen opined that the vehicle collision injured Clark's cervical and lumbar spine. The lumbar injury caused radiculopathy into the lower extremities. He explained that radiculopathy involves nerves traveling to a particular part of the

6

body and not functioning properly, thereby producing sensations of pain, numbness, tingling, and burning. Ericksen diagnosed Clark with radiculopathy after examining Clark and noting reduced or absent reflexes in both legs and atrophy in one leg. Ericksen noted that several medical doctors who had evaluated Clark and performed testing on him also had diagnosed Clark with radiculopathy.

Ericksen testified that Clark's electrodiagnostic study "showed evidence of impairment to multiple motor nerves in both legs." The impaired nerves innervated Clark's feet. Ericksen testified that Clark experienced radiating pain into his legs and could not stand or sit for more than a few minutes at a time. According to Ericksen, Clark must "alternate between standing and sitting for a period, but then he becomes intolerant to that and has to lay down."

Ericksen opined that Clark's car accident caused Clark to suffer a total loss of use of both his feet. Clark was unable to get and keep employment requiring the use of both feet because he was unable to stand or sit for more than a few minutes at a time and required frequent, intermittent breaks to lie down. In Ericksen's professional opinion, he testified Clark was not employable.

Clark testified in person. He explained how the collision occurred, what his initial pain symptoms were like, and how that pain evolved over the next year and continued into trial. He testified that the pain began in his lower back but later began radiating down his right leg. He began to experience numbness in both feet.

7

He also was sensitive to cold temperatures. By trial, his numbness had worsened so that both big toes were constantly numb. Clark testified that he could stand only for 15 minutes or so, then he had to sit. But he could not sit for long either.

In addition to the pain and constant numbness Clark experienced in his feet, Clark also testified to loss of use of both feet. He testified that his "ankles have given out" several times, causing him to lose his bodily control and fall. In other words, his feet at the ankles have failed to function and he has fallen as a result.

Clark was asked about the medical examination performed by the workers' compensation designated doctor, Bernstein. Clark testified that he told Bernstein he had pain radiating into his right leg and numbness in his left foot. When he participated in a functional capacity evaluation test, Clark could stand for only 18 minutes. After medical testing and evaluation of Clark, Bernstein gave Clark a whole person impairment rating of 25%. Clark testified that he would not be able to perform any activity that required him to be on his feet for hours at a time. And he has never been released to return to work.

### Parties' stipulations

After Clark testified, the parties' stipulations were read to the jury, including that Clark "sustained a compensable injury" on March 18, 2008, when his work truck was struck, and that he "reached maximum medical improvement on April

14, 2009, with a 25 percent impairment rating as certified by designated doctor, Melvyn Bernstein."

### *Clark's medical records*

Clark's medical records provided evidence of the various doctors' examinations, diagnoses, and impairment determinations. Bernstein's medical report stated that he saw Clark at the request of the Texas Department of Insurance, Division of Workers' Compensation for a "designated doctor evaluation." It noted findings from a 2009 MRI, including disc protrusions. It also noted findings from a 2009 electrodiagnostic study, including "evidence of impairment to multiple motor nerves in both legs . . . which is consistent with a diagnosis of a moderately severe mid to low lumbar central spinal stenosis."

Bernstein's report included his medical opinion that, at the time of the evaluation in April 2009, Clark was "still symptomatic" and had "reached Maximum Medical Improvement." Further, based on "the medical record as developed and on the entire examination detailed" in the report, Bernstein assigned Clark a "25% Whole Person Impairment" rating, noting, among other findings: (1) Lumbosacral spine impairment and spondylosis; (2) DRE lumbosacral category V: radiculopathy and loss of motion segment integrity; (3) a 4 to 5 mm anterior displacement of L5 over S1; and (4) "moderately severe impairment to multiple motor nerves in both legs . . . which supports and correlates with the physical

examination which demonstrated decreased deep tendon reflexes in both lower extremities combined with a bilateral, symmetric motor/strength deficit ranging from L2 through S1 or lower."

The medical records revealed that Dr. Gregory Ward had conducted a neurosurgical evaluation of Clark in March 2009, at which Clark reported numbness and tingling in his left foot and leg. Ward recommended a lumbar laminectomy at L4–L5 and L5–S1.

An April 2009 EMG report, included in the trial exhibits, stated abnormal findings, including "bilateral tibial and peroneal motor nerve conduction velocities" that are "mildly slowed below the knees," as well as "moderate to severely prolonged" "long wave studies (F- and H-waves)." Dr. Stoll's medical conclusion was that these findings revealed "evidence of impairment to multiple motor nerves in both legs . . . consistent with a diagnosis of a moderately severe mid to low lumbar central spinal stenosis."

Dr. Carla Michaels evaluated Clark in 2014. According to Michaels's notes, Clark reported that his "feet and toes are tingling," and he "continues to have numbness in both great toes due to L5 radiculopathy." Clark described his "radiating pain" as "burning, dull aching type pain." Additionally, Clark "has difficulty performing activities of daily living."

*The City's motion for directed verdict is denied*

At the conclusion of Clark's presentation of evidence, the City moved for a directed verdict, arguing that Clark's only injury was to his back and he could not meet the standard for injury to his feet to qualify for lifetime income benefits based on a total loss of use of both feet. Clark responded that, under Texas law, the qualifying injury could be direct or indirect, and, because he presented evidence that an injury to his back caused subsequent damage and indirect injury to his feet, he had sufficient evidence to preclude a directed verdict. Clark pointed to evidence that electrodiagnostic testing revealed impairment to multiple motor nerves in both his legs, as well as noted muscle atrophy and decreased strength in his legs. The City responded that any leg issues Clark had experienced originated at the site of injury to his lower back, not an injury to his feet. The trial court denied the City's motion for directed verdict.

*Testimony of Mauldin*

The City presented its only witness, Dr. Mauldin, by reading excerpts from his deposition testimony. Mauldin testified that he previously had a private practice in the Dallas area that focused on foot and ankle surgical care. In 2014, he closed his practice and began working exclusively within the workers' compensation area in the role of a designated doctor who evaluates workers' injury and determines any impairment rating or a medical examiner who evaluates workers and their

11

medical records to prepare reports on behalf of employers from whom the workers seeks compensation.

Mauldin was hired by the City to evaluate Clark. He testified that, during his evaluation, Clark discussed pain in his back and right leg but did not complain of pain in his left leg. Mauldin stated that Clark had a normal electrodiagnostic test which, in Mauldin's medical opinion, "pretty much rules out that there's any radiculopathy associated with this injury." Mauldin reiterated that, during his physical exam of Clark, Clark's "left leg never had any symptoms." Mauldin subsequently broadened his statement and testified that, on Clark's last exam, Clark "didn't even have any leg pain or any foot pain or any problems. . . . So there's—there would be no loss of use of those feet."

Clark's attorney read excerpts from Mauldin's deposition in which Mauldin agreed that multiple other doctors who had examined Clark or performed testing on him during the workers' compensation proceedings had concluded there was evidence of symptoms and injury to Clark's feet. Mauldin agreed that Dr. Mike Shah noted lumbar radiculopathy, weakness in the left leg, and numbness in the toes. He agreed that Dr. Mark Morris, Dr. Francisco Batlle, Dr. John Milani, and Dr. Carla Michaels had all noted lumbar radiculopathy in their medical assessments of Clark. Mauldin further agreed that another doctor, Dr. Ranil Ninala,

who had evaluated Clark and reviewed Clark's electrodiagnostic testing, concluded that Clark suffered from radiculopathy.

Mauldin acknowledged that the workers' compensation designated doctor, Dr. Bernstein, had determined Clark had a permanent whole person impairment rating of 25%, which was based, in part, on an electrodiagnostic study. While Bernstein had described the study as disclosing evidence of radiculopathy and "impairment to multiple motor nerves in both legs," Mauldin maintained that it was "normal." Mauldin conceded that a 25% impairment rating is a "high" level of impairment that is "generally" consistent with a "significant injury."

Mauldin acknowledged all these other doctors' opinions and then testified that he, nonetheless, holds the opposite opinion. In Mauldin's opinion, Clark did not suffer a severe injury; Clark had an "absolutely normal lower extremity exam"; Clark had no radiculopathy; and Clark had "no loss of use of those feet." Mauldin testified that, even though six other doctors had diagnosed radiculopathy and two doctors who evaluated Clark on behalf of his employer had found permanent impairment, in Mauldin's opinion, "there is not any objective evidence that this individual should not be capable of returning back to full function of whatever he was doing at the time of the injury based on the injury."

*Charge conference*

At the close of evidence, the court conducted a charge conference. The City objected to the wording of the single question to be asked of the jury. The City noted that the pattern jury charge does not discuss injury in terms of being "direct or indirect" and argued that the question to the jury should not discuss injury in those terms because it impermissibly comments on the weight of the evidence. The City also objected to the definition of "total loss of use," arguing that the phrase "by reason of such injury" should modify both parts of the definition but, as written, only modified one part. The trial overruled both objections.

*The court's charge to the jury*

The jury charge asked a single question after providing the jury four definitions/instructions. The question was as follows:

> Did PRINT CLARK suffer a direct or indirect injury to both feet at or above the ankles as a result of the accident of March 18, 2008, that was a producing cause of permanent and total loss of use of both feet at or above the ankles beginning on August 29, 2014?
>
> Answer "Yes" or "No"

The definitions/instructions all related to terms used in the single question. The two definitions/instructions relevant to this appeal are as follows:

> "Injury" means damage or harm to the physical structure of the body and such diseases or infections as naturally result from such damage or harm.

> "Total loss of use" of a member of the body exists whenever . . . [t]he condition of the injured member is such that the worker cannot get and keep employment requiring the use of such member.

The jury answered "Yes" to the single question, and the trial court entered a final judgment requiring the City to pay lifetime income benefits. The City appealed.

## Sufficiency of the Evidence

In its first issue, the City contends there is legally and factually insufficient evidence to support the jury's verdict because there is insufficient evidence that Clark suffered damage or harm to the physical structure of both feet or that he lost the use of both feet at or above the ankle.

### A.     Standard of review

Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally insufficient to support a finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it. *Id.* at 822. We credit favorable evidence if reasonable jurors

15

could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827.

In a factual sufficiency review, we consider and weigh all the evidence. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). When a party challenges an adverse finding on an issue on which it did not have the burden of proof at trial, like here, we conclude there is factually insufficient evidence only if the evidence supporting the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 209 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

We may not substitute our own judgment for that of the factfinder or pass upon the credibility of witnesses. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). The amount of evidence necessary to affirm the factfinder's judgment is far less than the amount necessary to reverse. *Levco Constr., Inc. v. Whole Foods Mkt. Rocky Mountain/Sw. L.P.*, 549 S.W.3d 618, 632 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)).

**B.      Injury to feet versus injury to other body structures, which then affects the feet**

Clark contends he suffered an indirect injury to his feet. The City contends Clark's only injury is to his back and what Clark experiences in his feet is simply

16

radicular symptoms. In distinguishing between injury to the feet and injury to other body structures which then affects the feet, the parties focus on three workers' compensation cases. These are *Insurance Company of the State of Pennsylvania v. Muro*, 347 S.W.3d 268 (Tex. 2011), *Dallas National Insurance Company v. De La Cruz*, 470 S.W.3d 56 (Tex. 2015), and *Travelers Indemnity Company of Connecticut v. Thompson*, No. 05-16-00816-CV, 2018 WL 524860 (Tex. App.—Dallas Jan. 24, 2018, pet. denied) (mem. op.). We discuss each in the order they were decided.

In *Muro*, the Texas Supreme Court held that a worker's loss of use of her feet did not qualify for lifetime income benefits under Section 408.161 absent "evidence of an injury to that body part." 347 S.W.3d at 270. The worker presented evidence that she injured her hips, lower back, right shoulder, and neck, as well as evidence that her injuries made it difficult for her to walk. *Id.* But other evidence indicated that functioning test results revealed "near normal function" and "normal sensation" in her feet. *Id.* at 270–71. While the hip injury impaired the use of her feet, there was no evidence of injury to the feet themselves. *Id.* at 270–71, 275–76 (distinguishing facts of Muro's injury from those detailed in *Hartford Underwriters Insurance Company v. Burdine*, 34 S.W.3d 700 (Tex. App.—Fort Worth 2000, no pet.), in which a worker had presented evidence of a back injury with radiculopathy that led to "muscular malfunction" and "footdrop," rendering

17

that worker unable to lift her feet, and concluding that, while the worker in *Burdine* presented evidence of indirect injury that had "extended" to the feet themselves, Muro had not). The Court concluded that Muro was not entitled to lifetime income benefits because she had not demonstrated an injury to her feet. *Id.* at 276.

The Texas Supreme Court decided *De La Cruz* four years later. There, a worker injured her back and knee. 470 S.W.3d at 57. After various medical interventions, she sought lifetime income benefits for total loss of use of both feet. *Id.* at 58. The Court reversed judgment in her favor, holding that her evidence of radiculopathy and "dermatomal loss" due to nerve damage in her back presented no evidence of damage or harm to the physical structure of her feet. *Id.* at 59. There was a single reference in her medical evidence to bilateral absence of ankle reflexes, but the court held that the evidence could not support a determination that the worker suffered a total loss of use of both feet because the record did not "identify whether the condition was transient or permanent in both ankles; whether it reflected more than damaged nerve roots in [her] back; whether [her] feet were unable to function properly; or whether the condition was permanent and caused permanent total loss of use of both feet." *Id.* The trial court rendered judgment denying the worker's claim for lifetime income benefits because her evidence was legally insufficient to meet the statutory requirements under Section 408.161. *Id.*

18

Three years later, the Dallas Court of Appeals distinguished *Muro* and *De La Cruz* to hold that an injured worker had presented sufficient evidence of "indirect physical damage and harm to his feet." *Thompson*, 2018 WL 524860, at *6 (affirming judgment awarding worker lifetime income benefits). Noting that evidence of radicular pain in the feet would be insufficient to establish an injury to the feet, the court noted additional evidence of injury, including evidence that the worker had "endured swelling, numbness, tingling, foot flare, decreased ankle reflexes, [and] sensitivity to hot and cold temperatures" in his feet. *Id.* The court held that this additional evidence provided legally sufficient evidence of symptoms of physical damage and harm to the feet.[1] *Id.*

While the damage may have been indirect and caused by the lengthy episodes of radiculopathy, that aspect of the injury did not affect eligibility for lifetime income benefits. *See id.* (holding that worker presented legally sufficient evidence that his "radiculopathy caused indirect physical damage and harm to his feet at or above the ankles . . . to support the jury's [lifetime income benefits]

---

[1] *Thompson* is procedurally similar to this case. The Division of Workers' Compensation determined that the worker did not qualify for lifetime income benefits, the worker filed a claim in district court, a jury returned a verdict in his favor that awarded lifetime income benefits, and the payor appealed. *Travelers Indem. Co. of Connecticut v. Thompson*, No. 05-16-00816-CV, 2018 WL 524860, at *1 (Tex. App.—Dallas Jan. 24, 2018, pet. denied) (mem. op.). Where the cases differ is that the payor in *Thompson* challenged only the legal sufficiency of the evidence that the worker suffered an injury to his feet, while, here, the City challenges both the legal and factual sufficiency of the evidence. *See id.*

award"). The Dallas court affirmed the trial court's judgment, and the Texas Supreme Court denied review of that decision. *Id.*

Combined, these cases establish that radicular pain is not evidence of an injury to the feet, themselves; however, radiculopathy can, over time, lead to indirect injury to the feet, which may be established through evidence of loss of ankle reflexes, sensitivity to hot and cold temperatures, permanent loss of functionality of the feet, or other damage to the feet.

## C.    Clark's evidence is legally and factually sufficient

Medical evidence was admitted for the jury's consideration. The jury was presented two opposite interpretations of that medical evidence by the parties' experts. Clark's treating provider, Ericksen, testified that Clark had lost the use of both feet due to injury and met the criteria for lifetime income benefits. The City's selected expert, Mauldin, testified that Clark's feet were not injured, he did not have radiculopathy, he did not suffer a permanent injury, and he was physically capable of working. Mauldin did not merely disagree with Ericksen's ultimate conclusions in this case; he disputed the existence of any permanent injury.

Against these two competing medical opinions, the jury received evidence that several other physicians had diagnosed Clark with an injury to his back and radiculopathy symptoms into his legs. Some of these physicians noted atrophy in one of Clark's legs, numbness in both his feet, and other foot symptoms. Mauldin

testified that he disagreed with the medical opinions and diagnoses of all these physicians. Mauldin also disagreed with these physician's interpretations of objective medical tests.

Mauldin stood alone in concluding that Clark was not permanently injured. Given Mauldin's disparate position, it is not unreasonable that, if the jury weighed the medical evidence and testimony with an eye toward rejecting one view as less credible, the jury might have found Mauldin's position to be the less credible. The determination of witness credibility, including expert witness credibility, is the jury's alone to make and will not be second guessed on appeal. *See Quiroz ex rel. Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 84 (Tex. App.—El Paso 2007, pet. denied) (stating that jury is free to believe or disbelieve all or part of any witness's testimony, including expert witnesses, and that, in face of conflicting expert testimony, appellate court cannot substitute its own judgment for that of jury).

Compounding Mauldin's susceptibility to a negative credibility finding was his own testimony demonstrating unfamiliarity with the standard for qualifying for lifetime income benefits due to loss of use of both feet. Mauldin testified that both subparts of the definition of "total loss of use" had to be met for a worker to qualify for benefits. In other words, according to Mauldin, a worker had to experience loss of substantial utility of the feet *and* not be able to get and keep

21

employment using the feet. Afterward, Mauldin was shown that the standard is stated in the disjunctive. *See Galindo*, 146 S.W.3d at 759 ("Total loss of use of a member of the body exists whenever by reason of injury such member no longer possesses any substantial utility as a member of the body or the condition of the injured member is such that the worker cannot get and keep employment requiring the use of such member."). Mauldin was then asked whether he remembered that it was a disjunctive test, and he replied, "Okay. If you say so." At the conclusion of the exchange, Mauldin stated that his ultimate conclusion remained the same regardless if the standard was disjunctive or otherwise. A jury reasonably could have factored this exchange into its credibility determination.

The evidence was not limited to medical records and competing expert testimony though. Clark provided direct testimony about his accident, pain, and resulting physical limitations. Clark testified that his condition worsened over time. What began as back pain, led to radiculopathy symptoms in his legs and, eventually, worsened to the point that his ankles would give out, causing him to fall. Additionally, his feet became sensitive to cold.

Clark's testimony went beyond complaints of radicular pain. *Cf. Muro*, 347 S.W.3d at 270. He detailed permanent symptoms and loss of functionality in his feet. *Cf. De La Cruz*, 470 S.W.3d at 59 (concluding that evidence was legally insufficient to support lifetime income benefits because record did not "identify

22

whether the condition was transient or permanent in both ankles; whether it reflected more than damaged nerve roots in [her] back; whether [her] feet were unable to function properly; or whether the condition was permanent and caused permanent total loss of use of both feet."). At least two physicians, including the designated doctor for workers' compensation benefits, had told him that he had reached maximum medical improvement years before trial. Clark's injuries were permanent: he would not improve. And Clark presented evidence that, at the time of trial, he had no tendon reflexes in his ankles and had repeatedly fallen because his ankles had given out. Thus, Clark presented evidence of injury to his feet that was permanent.

The injury to Clark's feet may have been indirect, in that it resulted from prolonged radiculopathy, but the indirect nature of his injury does not preclude recovery. *See Thompson*, 2018 WL 524860, at *6 (holding that worker presented legally sufficient evidence that his "radiculopathy caused indirect physical damage and harm to his feet at or above the ankles . . . to support the jury's [lifetime income benefits] award").

In sum, Clark testified that the integrity of his ankles was so compromised that he had spontaneously fallen more than once. A jury could have reasonably determined that having a body part repeatedly fail to function exceeded mere radiculopathy complaints and satisfied Clark's burden to present evidence of injury

to the body part and total loss of use of that body part. *See Dallas Nat'l Ins. Co. v. Morales*, 394 S.W.3d 826, 829–36 (Tex. App.—El Paso 2012, no pet.) (concluding that there was legally and factually sufficient evidence to sustain judgment that worker was entitled to lifetime income benefits on evidence worker had "difficulty walking, bending, stooping, squatting, and has a tendency to fall as his right knee gives way.").

The medical evidence, including the medical records and the testimony of Ericksen—who the City did not challenge on reliability, methodology, or any other ground—coupled with Clark's own testimony about the loss of use of his feet at or above the ankles met the threshold for factual and legal sufficiency. *See Thompson*, 2018 WL 524860, at *6 (legal sufficiency); *see Morales*, 394 S.W.3d at 829–36. The evidence supporting the jury's verdict is not so weak as to make its verdict clearly wrong or manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Choice! Power, L.P.*, 501 S.W.3d at 209.

We overrule the City's first issue.

## Excluded Evidence

Before applying for lifetime income benefits, Clark obtained workers' compensation benefits under a "supplemental income benefits" plan. According to the City's attorney at trial, the supplemental income benefits plan required Clark to submit job applications to qualify for that type of benefit. Clark did so. The City

sought to admit evidence of Clark's job applications, arguing that the evidence supported a reasonable determination that Clark believed he was physically able to work after his injury.

Clark objected to the job-application evidence, arguing, among other things, that the standards for supplemental income benefits and lifetime income benefits were not the same. The sole issue for the jury was whether Clark suffered an injury to his feet that resulted in loss of use of both feet. Whether Clark turned in job applications to meet supplemental-income benefit requirements and, as a separate question, whether Clark believed he would be physically able to do a job in the event he were hired, Clark argued, would not resolve the issue of whether he had lost the use of his feet. Moreover, there was evidence that Clark's condition had deteriorated since submitting at least some of the job applications, thereby further diminishing the probative force of the evidence.

Clark argued the evidence would confuse the issues for the jury and potentially prejudice Clark to a greater extent than the probative force of the evidence. *See* TEX. R. EVID. 403 (providing that trial court may exclude relevant evidence if its probative value is substantially outweighed by danger of, among other things, confusion of issues and misleading of jury).

The trial court sustained the objections for "numerous reasons . . . including, but not limited to jury confusion, Rule 403." In three issues, the City contends the

25

trial court erred in excluding evidence of Clark's job applications from the jury's consideration.

## A. Standard of review

The trial court has broad discretion to determine admissibility of evidence; as such, a reviewing court will reverse only if there is an abuse of that discretion. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001); *Perez v. DNT Glob. Star, L.L.C.*, 339 S.W.3d 692, 706 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A trial court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding principles. *Perez*, 339 S.W.3d at 706; *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 449 (Tex. App.—Houston [14th Dist.] 2002, no pet.). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

## B. Trial court did not abuse its discretion

Outside the presence of the jury, the City conducted a voir dire examination of Clark focused on his various job applications while seeking supplemental income benefits. Clark agreed that he was required to apply for jobs to qualify for that type of benefit. The City posited that it would be "dishonest" to apply for jobs that an applicant did not believe he could do and asked Clark whether he intended

to "waste" the employers' time by applying for jobs that he did not think he could physically do or did not have any intention of keeping. Clark responded:

> No. I applied for jobs that were accepting applications . . . whether I intended on keeping them or not, . . . it wasn't never thought. I was applying for whoever were taking applications. Those are the people that I applied to. . . . My intentions were if they were to call me for an interview and . . . if they were to hire me, I would try to do the job. . . . And if I couldn't, I couldn't . . . those were my intentions. . . . I was told that I had to *seek* employment.

(Emphasis added.) He later added that he "intended to *get* a job" but whether he "could *keep* it or not" was unknown; he "would have found out" once he tried the work. (Emphasis added.)

The City acknowledged that Clark had been required to seek employment to qualify for supplemental income benefits before transitioning to a claim for lifetime income benefits. Nonetheless, the City sought to present the job-application evidence to the jury to support an inference that Clark applied for the jobs because he believed he was physically able to do those jobs. Clark's voir dire testimony rejected that inference, explaining that he applied for jobs because he was required to submit application and that, if he were given a job—which never occurred—he might not be able to do it: "And if I couldn't, I couldn't."

This case presented a limited issue to the jury: whether Clark had lost the use of both his feet at or above the ankles such that he could not get and keep employment that required the use of his feet. *See* TEX. LAB. CODE § 408.161(a)(2).

27

Clark's testimony that he had applied for jobs because he was required to and that he did not know if he could do the work undercut the inference the City sought to draw from this job-applications evidence. Evidence of earlier actions taken by Clark while interacting with the workers' compensation system under a separate benefits scheme with a different standard of eligibility had the potential to confuse the issues before the jury. *See Serv. Lloyds Ins. Co. v. Martin*, 855 S.W.2d 816, 826 (Tex. App.—Dallas 1993, no writ) (affirming evidentiary ruling to exclude evidence related to prior workers' compensation claims, reasoning that, "because the incidents involve bodily injury and . . . filing of claims, it is likely that the introduction of this evidence would confuse the issues and might lead the jury into drawing incorrect inferences about the issues at hand. . . . [Moreover,] these dangers substantially outweigh the probative value of the evidence."). The probative value of the excluded evidence was further diminished when Clark testified that his physical condition deteriorated between when he had sought supplemental income benefits and when he later sought lifetime income benefits. Thus, his ability to do the work when he applied did not mean he could perform the work at the time of trial.

We conclude the trial court did not abuse its discretion in excluding evidence related to Clark's past efforts to apply for jobs while seeking a different type of workers' compensation benefit.[2]

## Jury Charge

The City's last issue concerns the single question in the court's charge. The City argues that the trial court erred by including additional words not found in the Pattern Jury Charge in that the additional words functioned as a comment on the weight of the evidence and misled the jury. The City concedes, though, that the jury charge question provided an accurate statement of the law.

### A. Standard of review

If a jury charge is legally correct, the trial court has broad discretion regarding how to submit the issues, including the wording of questions, definitions, and instructions. *Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 382 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g). We therefore review the City's

---

[2] The City also argues that the trial court erred by "effectively shutting down the City's cross examination of Mr. Clark." But the record does not support the City's contention. The City asked Clark a specific question on whether he would be able to do a hypothetical job that did not require him to stand for more than 30 minutes at a time or walk long distances. Clark objected that the question called for speculation, had no foundation, and was improper because Clark "is not a vocational expert." The trial court sustained Clark's objection. The City did not seek to question Clark further on the topic by narrowing its question, providing additional facts to its hypothetical, or otherwise addressing the bases for Clark's objection. Instead, the City switched to a different line of questioning. We reject the City's contention that the trial court prevented further cross-examination of Clark.

29

challenge to the trial court's jury charge under an abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g); *McFarland v. Boisseau*, 365 S.W.3d 449, 452 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *E.B.,* 802 S.W.2d at 649; *McFarland*, 365 S.W.3d at 452. A trial court has wide discretion in submitting instructions and jury questions.

## B.    Trial court did not abuse its discretion

Lifetime income benefits for the loss of use of both feet can be based on either a direct or indirect injury to the feet. *See Muro*, 347 S.W.3d at 275–76 (discussing facts of *Burdine*, 34 S.W.3d at 706). The question presented to the jury allowed for either form of injury:

> Did Print Clark suffer a direct or indirect injury to both feet at or above the ankles as a result of the accident of March 18, 2008, that was a producing cause of permanent and total loss of use of both feet at or above the ankles beginning on August 29, 2014?

The jury question the City proposed and the trial court rejected asked if Clark suffered "an injury" to both feet. Thus, the claim of error is the inclusion of the phrase "direct or indirect" to describe the injury. Yet, the City concedes the jury question provided a correct statement of law.

We conclude it was neither arbitrary nor unreasonable to include the phrase "direct or indirect" in the jury question to accurately convey the correct legal

30

standard for recovery. *See McFaland*, 365 S.W.3d at 452 (stating that trial courts have wide discretion in submitting jury questions); *Dabney v. Wexler-McCoy, Inc.*, 953 S.W.2d 533, 536 (Tex. App.—Texarkana 1997, pet. denied) (instruction was correct statement of law and did not refer to specific facts of case to directly comment on weight of evidence; therefore, instruction was not error).

The City argues that the inclusion of the phrase "direct or indirect" required "further lengthy instructions explaining that radiculopathy and post laminectomy syndrome do not constitute damage or harm to the physical structure of both feet." The City's argument does not support a conclusion that the trial court abused its discretion for two reasons.

First, the City did not request an instruction that radiculopathy would not, standing alone, qualify as an injury. The City cannot contend on appeal that the trial court erred in failing to include an instruction it never requested. *See Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 602–03 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); TEX. R. EVID. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment.").

Second, the definitions that were included in the jury charge informed the jury that an "injury" meant "damage or harm to the physical structure of the body"

and that "total loss of use of a member of the body" meant, in the context of this case, that the "condition of the injured member is such that the worker cannot get and keep employment requiring the use of such member." Combined, these instructions informed the jury that Clark's feet must have been damaged or harmed and it would be insufficient if his back injury caused him to not use his feet. *See Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 637 (Tex. App.—Fort Worth 2011, pet. denied) (concluding trial court did not err in refusing additional instructions given instruction already included in charge adequately informed jury of theories). To the extent there was any doubt on this issue, the City explicitly told the jury, without objection, during closing argument, that the injury had to be to Clark's feet and that radicular pain was not within the definition of an injury.

We conclude the trial court did not abuse its discretion in its phrasing of the jury question.

## Conclusion

We affirm the trial court's judgment.


Sarah Beth Landau
Justice

Panel consists of Justices Lloyd, Landau, and Countiss.